IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MOHAMAD NOURI | : | |
| | : | |
| Plaintiff | : | |
| v. | : | CIVIL NO.  4:10-CV-00934 |
| | : | |
| PENNSYLVANIA STATE | : | (Judge Brann) |
| UNIVERSITY | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM
July 2, 2015

Currently pending before this Court is the Defendant Pennsylvania State University's ("PSU") Motion for Summary Judgment (ECF No. 100) and accompanying statements of facts and legal briefs, (ECF Nos. 101, 110, 111), as well as plaintiff Mohamad Nouri's brief in opposition.  (ECF No. 109).  The matter has been fully briefed and is now ripe for disposition.  For the following reasons, the Motion for Summary Judgment is granted in full.

## I. BACKGROUND[1]

The Plaintiff in this matter, Dr. Nouri, was born in Iran and is Muslim. (ECF No. 37, ¶¶ 6, 7).  He earned a doctoral degree in mathematics from University of London, King's College and thereafter held teaching positions at several international universities.  Id. at ¶ 8.  In 1988, Dr. Nouri was hired by PSU

---

[1] The following background is culled from undisputed facts.  See (ECF Nos. 100, 109).  Where conflicts in material facts exist, those facts are presented in the light most favorable to Dr. Nouri.

as an associate professor in mathematics; in 1991 he was granted tenure and promoted to full professor at PSU.  (ECF No. 100, ¶¶ 1, 3).  Between 1975 and 1991, Dr. Nouri published sixteen papers in professional, peer-reviewed journals of mathematics; since 1991, Dr. Nouri has published one paper in a professional, peer-reviewed journal.  Id. at ¶¶ 2, 4.

In 1995, Dr. Nouri filed complaints with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Commission on Human Relations ("PCHR"), alleging that PSU was engaging in discrimination on the basis of race, religion, and national origin.  (ECF No. 37, ¶ 32).  In 1997, Dr. Nouri filed a civil rights suit against PSU, docketed with this Court as case number 4:97-cv-01317.  Id. at ¶ 33.  After a trial on that matter, the jury rendered a split verdict, finding against Dr. Nouri for claims of discrimination, but for Dr. Nouri on claims of retaliation.  (ECF No. 101, Ex. A, 138:3-138:11).

In 2001, Dr. Nouri filed a second lawsuit against PSU, docketed with this Court as case number 4:01-cv-00840, alleging that he was denied appropriate salary increases on the basis of his age, national origin, and religion (the "2001 lawsuit").  (ECF No. 100, Ex. 4).  In 2003, a jury found in favor of PSU on all counts.  Id. at Ex. 6.

**A. 2001 Lawsuit Discovery**

In the 2001 lawsuit, PSU denied any discrimination or retaliation, and argued that Dr. Nouri received diminished salary increases based in part upon his Faculty Activity Report ("FAR") scores.  (ECF No. 100, Ex. 7).  FARs are "a form of self-evaluation prepared by each faculty member at PSU on an annual basis . . . which are used in connection with the annual faculty review process."  (ECF No. 101, p. 4).  These reports are intended to accurately reflect the faculty member's activities over the course of the year in areas such as scholarly research, teaching, and university service.  Id.  Dr. Nouri did not fill out the FARs himself, did not receive copies of the FARs, and did not sign the FARs.  (ECF No. 100, Ex. 17, p. 16-17).  Dr. Nouri considered the FARs to be informal documents, and did not believe full citations for legal research or publications were required.  (ECF No. 109, Ex. 1, pp. 104, 112).  Nonetheless, Dr. Nouri understood that PSU believed that the FARs would be accurate.  (ECF No. 110, Ex. 2, p. 122).

PSU's annual performance evaluations were partially based upon the FARs provided by faculty members.  Id. at Ex. 8.  Dr. Nouri's performance evaluations noted consistently positive teacher evaluations but, beginning in 1998, documented a downward trend in research evaluations.  Id.  By the year 2000, no annual evaluation rated Dr. Nouri's research performance above "Poor."  Id.

During the discovery process, James Horne, Esquire, outside counsel representing PSU in the 2001 lawsuit, submitted discovery requests for all

documents supporting claims made in the FARs relating to, *inter alia*, publications and participation in professional meetings.  Id. at Ex. 10.  On October 25, 2011, Dr.  Nouri, through his counsel Kim Borland, Esquire, provided a supplemental response to the discovery request which included attached seminar materials, publications, and notes on a textbook that Dr. Nouri was writing.  Id. at Ex. 13.

The attached seminar materials included a presentation on neuro-networks, approximations, adaptive systems, and signal processing at the International Symposium of Telecommunications in Tehran on August 30, 2001 (the "Tehran Conference").  Id.  The publications provided included: (a) "Application of Dynamic Neural Networks to Approximation and Control of Nonlinear Systems"; (b) "Optimal Control of Flexible Systems by a Mathematical Programming Approach"; (c) "Neural Nets for an Adaptive Control"; (d) "Controller Design for Large Flexible Space"; (e) "Approximation and Control for Systems Using a Neural Net"; (f) "Dynamic Back Propagation Experiments"; and (g) "Introduction to Artificial Neural Networks."  Id.

During an October 31, 2001 deposition, Dr. Nouri examined the documents that had been provided to PSU during discovery, and acknowledged that the documents were his work and that he had supplied them.  Id. at Ex. 14.  Dr. Nouri later stated that he did not look through the documents that were produced in the deposition.  Id. at Ex. 17, p. 40-41.  Without thoroughly examining the documents,

Dr. Nouri noticed that the documents discussed neuro networks and controls; therefore, he admitted they were his documents because "there is nobody else in that work of either neuro network or control in Northeast Pennsylvania." Id. at 41. During a June 18, 2002 deposition, Dr. Nouri was confronted with a copy of "Application of Dynamic Neural Networks to Approximation and Control of Nonlinear Systems" bearing only his name. Id. at Ex. 15, p. 4. Dr. Nouri did not deny the authenticity of that document, and acknowledged that it was his work. Id.

During the course of discovery, Mr. Horne became concerned that many of the documents that Dr. Nouri produced and represented as his own work were substantially similar to work published by other individuals. Id. at Ex. 16, pp. 48-65. Mr. Horne first noticed that Dr. Massoud Amin had published an article entitled "Application of Dynamic Neural Networks to Approximation and Control of Nonlinear Systems" and did not list any collaboration with Dr. Nouri. Id.

In his efforts to defend PSU, Mr. Horne continued to gather information regarding Dr. Nouri's reported publications, and sought to discover if any further inconsistencies existed. Id. at 63-65. Mr. Horne's investigation was wholly relevant to the ongoing litigation. Id. at Ex. 13, pp. 41-42. Mr. Horne, as was his normal practice, conveyed his concerns to PSU regarding Dr. Nouri's claimed publications. Id. at 69-70. In that regard, on November 11, 2001, Mr. Horne sent an e-mail to two PSU employees, Gary Schultz and Mary Hines, notifying them

that he had "very good evidence of what [he] perceive[d] as clear misconduct by [Dr.] Nouri[.]" (ECF No. 109, Ex. 4).

Mr. Horne continued to investigate Dr. Nouri's publications, and by October 2002, decided that he had accumulated sufficient information to file a complaint of academic misconduct with PSU. (ECF No. 100, Ex. 13, pp. 96-97). Mr. Horne compiled the documents and created a report that broadly outlined his findings; the report and documents were then submitted to Candice Yekel at the Office of Research Protections. Id. at pp. 103-04.

**B. University Investigation**

Around October 2002, Mr. Horne presented his findings and report to "folks at the university[.]" (ECF No. 100, Ex. 13, pp. 103-04). After Mr. Horne reported the alleged misconduct to PSU, an investigation was launched under Policy RA10 ("RA 10") of the PSU Policy Manual which prohibits plagiarism among PSU's professors; this calls for the creation of a committee to examine the allegations. Id. at Ex. 16, p. 73-74; Ex. 21. The RA 10 Committee, which consisted of Ms. Yekel, Vice President of Research Eva Pell, and then Dean Eric Barron (now President of PSU),[2] met to complete an inquiry into possible misconduct. (ECF No. 100, Ex.

---

[2] Ordinarily, the budget executive of the accused individual's tenure college would be appointed to the RA 10 committee. (ECF No. 100, Ex. 23, pp. 18-19). However, Mr. Barron was instead appointed to the committee because the Dean of Dr. Nouri's tenure college may have been aware of the ongoing litigation between Dr. Nouri and PSU. Id. at Ex. 24. Dean Barron was selected in part because he had no involvement in the litigation. Id. at Ex. 26.

16, p. 74).  The purpose of an RA 10 Committee is to determine whether there is enough information to warrant a formal investigation.  Id. at Ex. 22, p. 25.  On November 6, 2002, Dr. Pell sent a letter to Dr. Nouri notifying him of the investigation, which specifically related to Dr. Nouri's Tehran Conference presentation, and an allegation that his presentation used, without citations or reference, information created by Dr. Jose Principe.  Id. at Ex. 24.

During this meeting, Dr. Nouri admitted that he used materials and information created by Dr. Principe, but maintained that he used only a small part of Dr. Principe's work, and properly attributed the information to Dr. Principe.  Id. at Ex. 27, p. 4.  Dr. Nouri showed Dr. Principe's book and CD to the audience, and provided the audience with Dr. Principe's website.  Id.

The RA 10 Committee concluded that there was sufficient evidence to launch a formal investigation.  Id. at Ex. 28.  The RA 10 Committee noted that the presentation slides Dr. Nouri provided during litigation were substantially identical to Dr. Principe's slides from a prior presentation, except that any slides referencing Dr. Principe were excised from the presentation.  Id. at Ex. 28.  Ms. Yekel stated that the RA 10 Committee was not made aware of the details of Dr. Nouri's ongoing litigation with PSU, and that the litigation had no effect on the RA 10 Committee's decision.  Id. at Ex. 16, pp. 81-82.

7

On February 14, 2003, Dr. Nouri was notified that an Investigatory Committee had been formed to research academic misconduct. Id. The Investigatory Committee was comprised of five tenured professors: John Wyngaard, Lee Giles, David Russell, John Dawson, and Kultegin Aydin. Id. at Ex. 41, p. 1. Ms. Yekel served as staff for the Investigatory Committee. Id. at Ex. 28. None of the professors taught at Dr. Nouri's campus, none of the professors had any conflicts of interest, and none of the professors knew of Dr. Nouri or the ongoing litigation. Id. at Ex. 17, p. 120; Ex. 28. The Investigatory Committee was charged with: (1) determining whether Dr. Nouri had plagiarized[3] Dr. Principe's work for the Tehran Conference and (2) determining whether there was a pattern of plagiarism in other works by Dr. Nouri. Id. at Ex. 28.

Accused individuals are kept apprised of the Investigatory Committee's progress throughout the investigation and are given "the opportunity at multiple times throughout the process to meet and discuss" issues with the Investigatory Committee. Id. at Ex. 22, p. 76. The individual is allowed to review reports and transcripts of interviews and offer comments on those documents. Id. at 76-77. He or she is also encouraged to submit any documents that may support a defense. Id. at 77. The burden rests on PSU to prove by a preponderance of the evidence that an individual committed plagiarism. Id. at 48; Ex. 41, p. 4.

---

[3] Plagiarism was defined by the Investigatory Committee as "the unattributed use of someone else's material." (ECF No. 100, Ex. 16, p. 93).

The Investigatory Committee was provided with the documents that Mr. Horne had obtained, including his report, and was informed that the documents had been obtained during the course of litigation between Dr. Nouri and PSU.  Id. at Ex. 16, p. 100.  However, no members of the Investigatory Committee were provided any information regarding the details of the lawsuit.  Id.  None of the committee members were familiar with Dr. Nouri.[4]  Id. at 92.  No person outside of the Committee attempted to influence the outcome of the proceedings.  Id. at 100.

Prior to the Investigatory Committee conducting any interview with Dr. Nouri, Ms. Yekel requested that Dr. Nouri provide a complete and current curriculum vitae as well as a complete list of references for all publications and copies of any manuscripts that he was working on.  Id. at Ex. 40.  Dr. Nouri informed Ms. Yekel that the "information ha[d] already been provided . . . [and he had] no further submissions to add to" the documents already provided.  Id.

On June 10, 2003, the Investigatory Committee met with Dr. Nouri and his counsel.  Id. at Ex. 29, p. 2.  During the interview, Dr. Nouri was first asked about the Tehran Conference presentation and why the presentation was nearly identical to Dr. Principe's presentation.  Id. at 9, 12-13.  Dr. Nouri stated that the presentation slides were in fact Dr. Principe's, but Dr. Nouri had not presented those slides at the Tehran conference.  Id. at 10-11.  He later stated that he had

---

[4] Dr. Dawson "may" have had some connection with Dr. Nouri on administrative matters during the 1990's.  Id. at 92.

used some of Dr. Principe's slides at the conference and had discussed Dr. Principe's work with the audience.  Id. at 12.

When asked why the title page of the slides bore his name rather than Dr. Principe's, Dr. Nouri stated "I don't know where you got this from, and I don't know anything about this[.]"  Id. at 12-13.  The Investigatory Committee iterated that the documents had been provided by Dr. Nouri's attorney during discovery in his federal lawsuit.  Id. at 14.  Dr. Nouri insisted that he did not know how his attorney had obtained the files or why they were produced.  Id. at 15.

The Investigatory Committee then asked Dr. Nouri about a paper submitted during discovery, with only his name listed as an author, entitled "Introduction to Artificial Neural Networks" and why some portions of that paper were identical to a thesis written by Dr. Nouri's former student, Thomas Rusnock.  Id. at 22.  Dr. Nouri asserted that he knew nothing about the paper and had never submitted a paper with that title; he believed that the alleged paper may have simply been a presentation he made to his class.  Id.  Beyond that, Dr. Nouri had no explanation for similarities between Mr. Rusnock's thesis paper and the paper submitted by Dr. Nouri's attorney during litigation.  Id. at 25.

Thereafter, Dr. Nouri was questioned regarding similarities between an article submitted by his attorney in litigation entitled "Approximation and Control of Systems Using a Neural Net" which listed Dr. Nouri as the sole author, and a

student thesis produced by Mark Ermish.  Id. at 26.  The Investigatory Committee

noted that Dr. Nouri's article used "text that is identical" to that used by Mr.

Ermish.  Id.  Dr. Nouri informed that Investigatory Committee that he had assisted

Mr. Ermish with his undergraduate thesis paper, and that they had co-published

that thesis.  Id. at 26-27.  Dr. Nouri had "no way of knowing" where the

plagiarized paper had come from, and he had "no idea how" his name alone came

to be on that paper.  Id. at 27, 31.

When the Investigatory Committee questioned Dr. Nouri regarding the

materials submitted by his attorney during litigation purporting to be portions of

Dr. Nouri's book in-progress, Dr. Nouri denied any knowledge of the documents

submitted.  Id. at 48.  Dr. Nouri hypothesized that perhaps his attorney had

accidentally included materials that Dr. Nouri used in lectures as materials that

were part of his book.  Id.  At the conclusion of the interview, Dr. Nouri reiterated

to the Investigatory Committee that he had used Dr. Principe's work in his Tehran

conference presentation.  Id. at 53-55.  However, Dr. Nouri remained adamant that

he had properly cited and credited Dr. Principe for his work.  Id.

On March 31, 2003, the Investigatory Committee interviewed Mr. Horne.

Id. at Ex. 34, p. 1.  Mr. Horne explained how he obtained the relevant materials

that he eventually forwarded to PSU, and how he came to be suspicious of possible

plagiarism on Dr. Nouri's part.  Id. at 2-17.  The Investigatory Committee also

11

interviewed Jeffrey Senese regarding his inability to verify any publications listed on Dr. Nouri's FARs and suspicions regarding the accuracy of the FARs.  Id. at Ex. 35.  The Investigatory Committee additionally interviewed Ervin Rodin, Dr. Principe, Dr. Amin, and Patrick Simpson.  Id. at Ex. 36, 37, 38, 39.

### C. Investigatory Committee Conclusions

Upon completing its interviews, the Investigatory Committee identified several examples of possible plagiarism, and divided these examples among the Committee.  Id. at Ex. 16, p. 95.  Each member of the Investigatory Committee wrote one section of the final report, with each section addressing one possible act of plagiarism.  Id. at 98.  After deliberating, on July 22, 2003 the Investigatory Committee unanimously concluded that a pattern of unattributed use and plagiarism existed.  Id. at Ex. 41.  The Investigatory Committee reached five conclusions.

First, that Dr. Nouri had presented Dr. Principe's slides at the Tehran Conference without permission, but did cite to Dr. Principe's work during that presentation.  Id. at 6-7.  The Investigatory Committee concluded that this was improper, and constituted plagiarism.  Id. at 15.  Second, that Dr. Nouri's article "Introduction to Artificial Neural Networks" was in fact plagiarized nearly word for word from the work of Mr. Rusnock.  Id. at 7-8.  Although Dr. Nouri never

published or circulated the paper, this fact was deemed irrelevant because Dr.

Nouri had presented the paper "as his own work in a court of law." Id. at 8.

Third, that Dr. Nouri had plagiarized the work of his former student Mr.

Ermish. Id. at 15.  The Committee considered that fact that Dr. Nouri had

submitted a paper during litigation that was "derived in large part" from a joint

publication he had previously published with Mr. Ermish.  Id. at 8.  However, the

paper produced during litigation did not bear Mr. Ermish's name.  Id.  The

Investigatory Committee considered Dr. Nouri's claim that his previous attorney

had removed Mr. Ermish's name from the paper, but ultimately reasoned that this

explanation was "highly unlikely[.]" Id. at 9.

Fourth, that Dr. Nouri had plagiarized materials from Dr. Amin.  Id. at 12.

Specifically, the Committee noted that Dr. Nouri's paper "Application of Dynamic

Neural Networks to Approximation and Control of Nonlinear Systems" was copied

nearly verbatim from Dr. Amin's paper bearing the same title.  Id. at 10.

Furthermore, Dr. Nouri's paper copied large portions of a different paper written

by Dr. Amin, "Neurocontrol of Nonlinear Systems via Local Memory Neurons."

Id.  Dr. Nouri argued that Dr. Amin had perhaps plagiarized Dr. Nouri's work, a

claim that the Committee found to be "egregious."  Id. at 12.

Finally, the Investigatory Committee concluded that Dr. Nouri had

Plagiarized materials from Mr. Simpson's book "Artificial Neural Systems" for use

in seminars and in Dr. Nouri's "book in progress." Id. at 15.  The Committee noted that Dr. Nouri denied providing the plagiarized materials to his attorney, and asserted that he did not know how the materials came to be submitted during federal litigation.  Id.  However, the Committee concluded, based on Dr. Nouri's representations during an October 31, 2001 deposition, that he had in fact provided the materials and acknowledged that they were his.  Id.

As a result, the Investigatory Committee concluded that Dr. Nouri was "guilty of willful scientific misconduct (as defined in PSU Policy RA10) in carrying out and reporting research." Id.  One of the Committee members explained that even a lay person could see that the materials were plagiarized since "the equations . . . were, in fact, lifted wholesale from other sources, texts and equations." Id. at Ex. 16, p. 93.  The recommended sanction was Dr. Nouri's dismissal from PSU.  Id. at Ex. 41, p. 15.

Dean Barron and Dean Pell agreed with the findings and recommendations of the Investigatory Committee.  Id. at Ex. 42.  Dean Daniel Larson was notified of this decision, and Dean Larson thereafter forwarded the Investigatory Committee Report to the Chair of the Standing Joint Committee on Tenure for consideration. Id. at Ex. 45.

**D. Tenure Committee**

Policy HR 23 governs the dismissal of a tenured professor at PSU.  Id. at Ex. 46.  HR 23 provides that a Standing Joint Committee on Tenure ("Tenure Committee") must be comprised of five members – two administrative representatives and three tenured faculty members.  Id. at 12.  The tenured professor who is being sanctioned must have the opportunity to appear and defend him or herself at a hearing before the Tenure Committee.  Id.  At that hearing, evidence may be presented, and the burden of proving cause for termination rests on PSU.  Id. at 14.  The Tenure Committee is advisory only and simply renders a report to the President of PSU.  Id. at 12.

The Tenure Committee held a hearing with Dr. Nouri on February 28, 2004, where Dr. Nouri was represented by counsel.  Id. at Ex. 16, p. 1, 5.  The Tenure Committee was comprised of Professor Gordon Dejong, Professor Jill Findeis, Professor Martin Tretheway, Dean Susan Welch, and Dean Judy Olian.  Id.  Both Dr. Nouri and PSU submitted briefs to the Tenure Committee prior to the hearing. Id. at Ex. 47, p. 27.  Dean Welch had never heard of Dr. Nouri prior to the hearing, nor had she had any conversations with Ms. Yekel, Robert Secor, or Drs. Erickson, Barron, Slann, Senese, or Pell.  Id. at 36.

The hearing lasted approximately eleven hours, during which time both Dr. Nouri and PSU were provided the opportunity to give opening and closing statements, as well as examine and cross-examine witnesses.  Id. at Ex. 16, p. 1, 4.

To maintain the integrity of the hearing, each witness was sworn in and sequestered.  Id. at 4.  The Tenure Committee was instead charged with reaching an independent determination after reviewing the matter with "fresh eyes."  Id. at Ex. 16, p. 10.  During the hearing, the Tenure Committee heard testimony from Dr. Nouri, Mr. Horne,[5] Ms. Yekel, Dr. Wyngaard, Farokh Marvasti, Mr. Ermish, Mr. Rusnock, Ali Hurson, Dean Barron, Wayne Felty, and Ken Boback.  Id. at 2.

After interviewing Ms. Yekel and Dr. Wyngaard about the Investigatory Committee process, the Tenure Committee took testimony from Dr. Nouri.  Dr. Nouri explained that he did not use complete citations on his FARs due to an oversight on his part.  Id. at 197-98.  Dr. Nouri again asserted that he was shocked by the existence of, and had "no knowledge" of, papers that were submitted during litigation bearing only his name rather than the names of all co-authors.  Id. at 199-201; Ex. 17, p. 19.

Dr. Nouri later asserted that at least one of these documents was tampered with, as evidenced by the fact that the line listing Dr. Nouri as the sole author was crooked.  Id. at Ex. 17, pp. 37-38.  He also pointed out that, while he was listed as the sole author, the paper's abstract continually used the word "we" rather than "I."

---

[5] Mr. Horne's testimony was substantially similar to his testimony before the RA 10 Committee and the Investigatory Committee.  However, he also informed the Tenure Committee that neither he nor anyone in his office altered the documents provided by Dr. Nouri's attorney, other than to affix Bates numbers to the pages.  Id. at 113-14.

16

(ECF No. 109, Ex. 1, p. 219).  Dr. Nouri also produced a version of the Dr. Amin

paper with the names of all authors listed.  Id. at Ex. 5.

Farokh Marvasti testified that Dr. Nouri "did mention the work of Professor

Principe, as well as others" during the Tehran Conference.  (ECF No. 109, Ex. 6).

In a separate affidavit, Dr. Marvasti asserted that "Dr. Nouri's transparencies were

different from [Dr.] Principe's paper."  Id. at Ex. 8.  Dr. Nouri also presented the

testimony of a computer expert who stated that the slides used for the Tehran

conference were modified on August 27, 2001 at 5:15 a.m.  Id. at Ex. 7, p. 90.  Dr.

Nouri testified that, at that time, he was already on his way to Tehran and therefore

he could not have made any changes to the slides.  Id. at Ex. 1, p. 138.  He asserted

that the cover page for his Tehran Conference presentation had been fabricated.

(ECF No. 100, Ex. 18, p. 151).

Dean Welch later testified that she had never experienced any pressure to

reach a specific outcome.  Id. at Ex. 47, p. 72.  To her knowledge, no members of

the Tenure Committee knew of Dr. Nouri prior to the hearing.  Id.

The Tenure Committee deliberated and unanimously concluded that PSU

had sustained its burden of proving that "Dr. Nouri engaged in repeated acts of

plagiarism through a course of conduct of using the work of others without

appropriate attribution."  Id. at Ex. 48, p. 12.  The Tenure Committee rejected Dr.

Nouri's claim that the documents provided during litigation were not his own.  Id.

at 10.  The Committee noted that Dr. Nouri was "accountable" for anything provided by his attorney and, furthermore, rather than disavowing the document, Dr. Nouri acknowledged that the documents were his during a deposition.  Id.  Consequently, the Tenure Committee believed his later protestations were "unsubstantiated and lack[ed] credibility."  Id.  The Committee recommended that Dr. Nouri be terminated from employment at PSU.  Id. at 12.

### E. Dr. Nouri's Termination and Its Aftermath

On April 15, 2004, then PSU President Graham Spanier upheld the Tenure Committee's finding and terminated Dr. Nouri from his position with PSU.  Id. at Ex. 58.  Prior thereto, on July 24, 2003, Dr. Nouri filed complaints with the PCHR and the EEOC.  Id. at Ex. 68.  Dr. Nouri alleged retaliation based on his April 30, 1999 report to the PCHR, but did not allege any discrimination on the basis of national origin or religion.  Id.

On November 8, 2006, the PCHR completed its investigation and submitted its findings, concluding that there was "no probable cause" for any of Dr. Nouri's claims.  Id. at Ex. 59.  The PCHR concluded that there was no evidence that the reasons provided by PSU for Dr. Nouri's termination were pretextual.  Id.  On April 30, 2010, Dr. Nouri filed this suit.  (ECF No. 1).  Dr. Nouri continues to maintain that any documents listing him as the sole author were tampered with,

although he has no knowledge as to who may have tampered with the documents. (ECF No. 100, Ex. 2, pp. 215-17).

### F.  Application of RA 10 to Other PSU Employees

Between July 31, 2000 and July 31, 2003, eight individuals were investigated by PSU for research misconduct under RA 10.  Id. at Ex. 59, p. 29.  Of these eight individuals, only one was treated more favorably than Dr. Nouri, but PSU offered a reasonable explanation for the disparate treatment of that one individual.  Id. at 30.  At least two similarly situated individuals were treated in the same manner as Dr. Nouri.  Id. at 29-30.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" where it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" where "the evidence is such that a reasonable jury," giving credence to the evidence favoring the nonmovant and making all inferences in the nonmovant's favor, "could return a verdict for the nonmoving party."  Id.

The burden of establishing the nonexistence of a "genuine issue" rests on the party moving for summary judgment.  In re Bressman, 327 F.3d 229, 237 (3d Cir.

2003) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 331 (1986) (Brennan, J.,

dissenting)).  The moving party may satisfy this burden by either (1) submitting

affirmative evidence that negates an essential element of the nonmoving party's

claim; or (2) demonstrating that the nonmoving party's evidence is insufficient to

establish an essential element of the nonmoving party's case.  <u>Id.</u> at 331.

     Where the moving party's motion is properly supported, the nonmoving

party, to avoid summary judgment in his opponent's favor, must answer by setting

forth "genuine factual issues that properly can be resolved only by a finder of fact

because they may reasonably be resolved in favor of either party." <u>Anderson</u>, 477

U.S. at 250.  For movants and nonmovants alike, the assertion "that a fact cannot

be or is genuinely disputed must" be supported by "materials in the record" that go

beyond mere allegations, or by "showing that the materials cited do not establish

the absence or presence of a genuine dispute, or that an adverse party cannot

produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1); <u>see</u> <u>also</u>

<u>Anderson</u>, 477 U.S. at 248–50.

     In deciding the merits of a party's motion for summary judgment, the

Court's role is not to evaluate the evidence and decide the truth of the matter, but

to determine whether there is a genuine issue for trial.  <u>Anderson</u>, 477 U.S. at 249.

Although the Court may consider any materials in the record, it need only consider

those materials cited.  Fed. R. Civ. P. 56(c)(3).

20

## III. DISCUSSION

One count remains from Dr. Nouri's Amended Complaint: an allegation of a violation of Title VII of the Civil Rights Act against PSU.  (ECF No. 37).  Dr. Nouri alleges retaliation[6] based upon his complaints and lawsuits filed against PSU, national origin and religious discrimination, as well as a hostile work environment.  Id.  These issues will be addressed in turn.

### A.     National Origin and Religious Discrimination

Dr. Nouri alleges that PSU discriminated against him based on his national origin and religion.  (ECF No. 37).  PSU argues that: (1) Dr. Nouri failed to exhaust his administrative remedies for this issue, and (2) in any event, his claims must fail on the merits.  (ECF No. 101).

#### 1.     *Failure to Exhaust Administrative Remedies*

"It is a basic tenet of administrative law that a plaintiff must exhaust all required administrative remedies before bringing a claim for judicial relief." Robinson v. Dalton, 107 F.3d 1018, 1020 (3d Cir. 1997) (citing McKart v. United States, 395 U.S. 185, 193 (1969)).  In the context of a Title VII employment discrimination claim, a plaintiff generally must exhaust administrative remedies by filing a complaint with the EEOC prior to filing suit in federal court.  Atkinson v.

---

[6] In the complaint, Dr. Nouri also alleged post-termination retaliation.  (ECF No. 37).  However, Dr. Nouri concedes that this issue is barred by the doctrine of *res judicata*, (ECF No. 109), and therefore the Court will not address any claims of post-termination retaliation.

Lafayette Coll., 460 F.3d 447, 453 (3d Cir. 2006) (citing Waiters v. Parsons, 729

F.2d 233, 237 (3d Cir. 1984)).  When a complaint is filed with the EEOC, the

scope of the "civil action in the district court is 'defined by the scope of the EEOC

investigation which can reasonably be expected to grow out of the charge of

discrimination [.]'"  Hicks v. ABT Assoc., Inc., 572 F.2d 960, 966 (3d Cir. 1978)

(quoting Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398–99 (3d Cir.

1976)).

As the United States Court of Appeals for the Third Circuit has noted,

"[a]lthough this standard does not necessarily preclude a plaintiff from asserting a

claim for the mere failure to check a box on an EEOC Charge Form, it does

prevent a plaintiff from 'greatly expand[ing] an investigation simply by alleging

new and different facts when [s]he [is] contacted by the Commission following

[her] charge.'"  Barzanty v. Verizon PA, Inc., 361 F.App'x 411, 414 (3d Cir. 2010)

(quoting Hicks, 572 F.2d at 967) (alterations in original).

Individuals may bring a civil suit "based on new acts that occur during the

pendency of the case which are fairly within the scope of an EEOC complaint or

the investigation growing out of that complaint, without . . . [filing an] additional

EEOC complaint[]."  Waiters, 729 F.2d at 237 (citing Hicks, 572 F.2d at 966;

Ostapowicz, 541 F.2d at 399).  "The relevant test in determining whether [a

plaintiff is] required to exhaust her administrative remedies, therefore, is whether

the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." Id.

Here, the evidence supports a conclusion that Dr. Nouri did exhaust administrative remedies in regard to any claims of discrimination based on religion or national origin. The charge submitted to the PCHR and EEOC discussed in great depth the instances of retaliation that Dr. Nouri allegedly faced as a result of the 1999 charge and subsequent 2001 lawsuit. (ECF No. 100, Ex. 68). The headings for each count read "Retaliation – Discrimination." Id. Furthermore, each act of retaliation was premised on Dr. Nouri's challenge of PSU's allegedly discriminatory conduct. Even a cursory review of the charges and allegations listed in Dr. Nouri's complaint to the PCHR and EEOC would have led to an examination of instances of alleged discrimination. Consequently, charges of discrimination could reasonably be expected to grow out of any EEOC or PCHR investigation, and Dr. Nouri did in fact exhaust his administrative remedies.

2.   <em>Merits Analysis</em>

Title VII provides that it is "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The United States Supreme Court has

"established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).

Under this framework, a plaintiff "must first establish, by a preponderance of the evidence, a '*prima facie*' case of racial discrimination." Id. (citing Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981)).   If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to produce evidence which, if believed by the trier of fact, demonstrates "that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" Id. at 506-07 (quoting Burdine, 450 U.S. at 254-55).  If the defendant produces such evidence, the plaintiff must then demonstrate that the proffered reason for plaintiff's termination was merely pretextual.  Id. at 507-08 (quoting Burdine, 450 U.S. at 256).

Although the elements of a *prima facie* case "depend on the facts of the particular case," a plaintiff in a Title VII discrimination case must generally demonstrate that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered from some form of adverse employment action; and (4) these actions were taken under circumstances that give rise to an inference of unlawful discrimination.  Jones v. Sch. Dist. of Phila., 198 F.3d 403, 411 (3d Cir.

1999).  In this analysis, the focus "is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'"  Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 (3d Cir. 1999) (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)).

A plaintiff must also "establish some causal nexus between his membership in a protected class and the decision" to fire him.  Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003).  In other words, the plaintiff's religion or national origin must have been a "determinative factor" in the defendant's decision to terminate his employment.  Watson v. Se. Pa. Transp. Auth., 207 F.3d 207, 215 (3d Cir. 2000).

The first three elements are not in dispute here.  Dr. Nouri is Persian and Muslim, and therefore is a member of a protected class.  (ECF No. 1, ¶¶ 5-7).  He also holds a doctoral degree in mathematics from King's College at the University of London and has held teaching positions at several universities; consequently, he was qualified for his position.  (ECF No. 100, Ex. 1).  It is undisputed that PSU took adverse action against Dr. Nouri by terminating his employment with PSU. Id. at Ex. 58.  The only dispute is whether the circumstances of Dr. Nouri's termination give rise to an inference of unlawful discrimination.

Viewing the facts in the light most favorable to Dr. Nouri, he has failed to sustain his burden of demonstrating that the circumstances of his termination give

rise to an inference of discrimination based on either national origin or religion.

Dr. Nouri cites to several e-mails sent by PSU employees in support of his

contention that his termination was motivated by discrimination.  Dr. Nouri first

references a February 1999 e-mail from Mr. Secor, wherein Mr. Secor noted that

PSU was engaged in litigation with Dr. Nouri, and asserted that Dr. Nouri "is a

problem case."  (ECF No. 109, Ex. 2).  Dr. Nouri also cites to a March 2000 e-mail

sent by Dr. Hines that referenced "Nouri problems on campus."  Id.

Dr. Hines' e-mail further suggested isolating Dr. Nouri by assigning him to a

different campus, or simply buying him out to remove him from PSU.  Id.  In a

separate e-mail, Dr. Hines suggested forcing Dr. Nouri to "leave" either by

transferring or firing him.  Id.  Finally, in an e-mail dated January 12, 2001, Kathie

Flanagan-Herstek discussed issues related to Dr. Nouri, and concluded her e-mail

by stating "May Allah grant us all patience[.]"  Id.

As an initial matter, it bears emphasizing that each e-mail is dated between

the years 1999 and 2001.  Id.  In December 2003, a jury concluded that the

evidence presented by Dr. Nouri, including these e-mails, was insufficient to

support a finding that PSU discriminated against Dr. Nouri.  (ECF No. 100, Ex. 6).

Therefore, as this Court previously held, any claim based on this evidence is barred

by *res judicata*.  (ECF No. 35).  Even ignoring this issue, the e-mails presented by

Dr. Nouri fall woefully short of creating a genuine issue relating to discrimination.

The three e-mails which contain the most inflammatory language used, and which suggest that PSU was actively attempting to take adverse action against Dr. Nouri, all implicate claims of retaliation rather than discrimination.  As Dr. Nouri notes, Mr. Secor referred to him as "a problem case" due to ongoing litigation. (ECF No. 109, Ex. 2).  Additionally, Dr. Hines suggested isolating or firing Dr. Nouri due to the problems he was creating for PSU.  Id.  None of the e-mails in any way either states or implies that anyone at PSU was concerned with Dr. Nouri's religion or national origin.

The sole e-mail that may have referenced Dr. Nouri's religion merely states "May Allah grant us all patience[.]"  Id.  This statement alone is insufficient to create a genuine issue as to whether Dr. Nouri's termination was related to discrimination, particularly when viewed in context.  Ms. Flanagan-Herstek made this statement in the context of a complaint regarding difficulties with Dr. Nouri in teaching his courses, and therefore again properly relates to retaliation, rather than discrimination.  Id.  In short, her statement appears to have been made from frustration rather than discrimination.

At best, the evidence that Dr. Nouri cites to may create a genuine issue of material fact relating to retaliation.  It does not, however, establish a *prima facie* case of discrimination.  Furthermore, Dr. Nouri has failed to present any evidence that PSU treated him less favorably than other similarly situated people based on

Dr. Nouri's religion or national origin, as required to establish a *prima facie* case.

Pivirotto, 191 F.3d at 352.  In sum, Dr. Nouri has not presented evidence sufficient

to support an inference of discriminatory action.[7]  Therefore, summary judgment is

appropriate in favor of PSU on this issue.

### B.    Retaliation

Dr. Nouri next argues that PSU fired him in retaliation for his protected

activity.  (ECF No. 37).  Specifically, Dr. Nouri alleges that PSU retaliated against

him for his 1997 and 2001 lawsuits, as well as the prior PCHR and EEOC charges

related to those suits.  Id.

Title VII's anti-retaliation provision broadly provides that it shall be

unlawful "for an employer to discriminate against any of his employees . . .

because he has opposed any practice made an unlawful employment practice by

this subchapter[.]"  42 U.S.C. § 2000e-3(a).  The Third Circuit has repeatedly held

that "[t]o establish a *prima facie* case of retaliation under Title VII, a plaintiff must

tender evidence that: '(1) she engaged in activity protected by Title VII; (2) the

employer took an adverse employment action against her; and (3) there was a

causal connection between her participation in the protected activity and the

adverse employment action.'"  Moore v. City of Philadelphia, 461 F.3d 331, 340-

---

[7] Even if Dr. Nouri had satisfied his burden of establishing an inference of discriminatory action, as discussed *infra*, PSU has articulated a non-discriminatory reason for terminating Dr. Nouri's employment, and Dr. Nouri has failed to establish that these reasons were pretextual.

41 (3d Cir. 2006), as amended (Sept. 13, 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)). Importantly, a plaintiff must prove but-for causation; that is, he or she must demonstrate "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013).

As with discrimination claims, if a plaintiff establishes a *prima facie* case of retaliation, "'the burden shifts to the employer to advance a legitimate, non-retaliatory reason' for its conduct and, if it does so, 'the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" Moore, 461 F.3d at 342 (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997)). "To survive a motion for summary judgment in the employer's favor, a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions." Id. (citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).

### 1. *Prima Facie Case*

It is undisputed that Dr. Nouri is able to prove the first two prongs of the *prima facie* standard; he undoubtedly engaged in protected activity by filing complaints of discrimination, and adverse action was taken when PSU terminated

his employment.  See (ECF No. 101, p. 19).  The only dispute is whether Dr. Nouri

has established a sufficient but-for causal connection between his participation in

the protected activity and his eventual termination.

"To establish the third element of the *prima facie* case . . . a plaintiff must

show a causal connection between the plaintiff's opposition to, or participation in

proceedings against, unlawful discrimination and an action that might have

dissuaded a reasonable worker from making or supporting a charge of

discrimination."  Moore, 461 F.3d at 341-42.  "Many may suffer . . . harassment at

work, but if the reason for that harassment is one that is not proscribed by Title

VII, it follows that Title VII provides no relief."  Id. (quoting Jensen v. Potter, 435

F.3d 444, 449 (3d Cir. 2006)).  Thus, "[t]he ultimate question in any retaliation

case is an intent to retaliate *vel non*."  Jensen, 435 F.3d at 449 n. 2.

### a.  *Evidence of a Causal Link*

The Third Circuit has previously cautioned that "each case must be

considered with a careful eye to the specific facts and circumstances encountered."

Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 n. 5 (3d Cir. 2000) (citing

Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997)).

Therefore, while "temporal proximity between the protected activity and the

alleged retaliatory act can be sufficient in itself to create an inference of a causal

connection for the purposes of a prima facie case of retaliation" such temporal proximity is not always necessary.  Id. at 279.  Thus,

> Where the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, or other types of circumstantial evidence, such as inconsistent reasons given by the employer for terminating the employee or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole.

Marra v. Phila. Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007) (citations omitted).

PSU points out that Dr. Nouri was not terminated from employment until 2004 – approximately nine years after he first reported PSU to the PCHR, and three years after he filed his May 2001 lawsuit.  (ECF No. 101, p. 20).  Dr. Nouri responds that, although he was not terminated until 2004, there is evidence suggesting that efforts to terminate him began as early as November 2001, six months after suit was filed.  (ECF No. 109, p. 7).

Although there is merit to Dr. Nouri's arguments regarding timing, a period of six months between a protected activity and the alleged retaliation is alone insufficient to give rise to an inference of a causal connection between the two events.  See, Bailey v. Commerce Nat. Ins. Services, Inc., 267 F.App'x, 167 (3d Cir. 2008) (holding that "four months between [plaintiff's] protected activity and termination is not unusually suggestive of retaliatory motive"); Fischer v. Transue, Civ. No. 04-cv-2756, 2008 WL 3981521, at *10 (M.D. Pa. Aug. 22, 2008)

(concluding that a twenty-two day temporal proximity is insufficient to establish causation); <u>Smith v. ABF Freight Sys., Inc.</u>, Civ. No. 04–2231, 2007 WL 3231969, at *11 (M.D. Pa. Oct. 29, 2007) (temporal proximity of one and one-half months was insufficient to establish causation).

However, Dr. Nouri does not rely solely on temporal proximity to build his case.  Rather, as discussed above, Dr. Nouri cites to several e-mails exchanged by PSU employees discussing the difficulties that Dr. Nouri created by way of, *inter alia*, his protected activities.  (ECF No. 109, Ex. 2).  One e-mail advocated directly for Dr. Nouri's termination, stating that "[w]e all know what we are really dealing with, and I do not expect things to improve here if we don't take some significant action."  <u>Id.</u>  A second e-mail suggested "isolating" Dr. Nouri since PSU could not build a case for terminating his employment.  <u>Id.</u>  This evidence would allow an inference of retaliatory animus if any of those individuals played a role in, or influenced in any way, Dr. Nouri's eventual termination.  However, PSU's impartial termination process severed any causal link.

b.     *Impartial Hearing and the Cat's Paw Theory*

Generally, when a decision to take adverse action is reached by one or more impartial decision makers, any causal connection between protected activity and the subsequent adverse action is severed.  <u>Weston v. Pennsylvania</u>, 251 F.3d 420, 433 (3d Cir. 2001), *abrogated in part on other grounds by* <u>Burlington N. & Santa</u>

Fe Ry. Co. v. White, 548 U.S. 53 (2006).  However, the Supreme Court has

rejected "a hard-and-fast rule" that an independent investigation and determination

alone will shield an employer from liability.  Staub v. Proctor Hosp., 562 U.S. 411,

420 (2011).  The Supreme Court elaborated that, under the "cat's paw" theory:

> if the employer's investigation results in an adverse action for reasons
> unrelated to the supervisor's original biased action . . . then the
> employer will not be liable. But the supervisor's biased report may
> remain a causal factor if the independent investigation takes it into
> account without determining that the adverse action was, apart from
> the supervisor's recommendation, entirely justified . . . The employer
> is at fault because one of its agents committed an action based on
> discriminatory animus that was intended to cause, and did in fact
> cause, an adverse employment decision.

Id.  Under this line of reasoning, an employer will be held liable only where a

"supervisor performs an act motivated by [a retaliatory] animus that is *intended* by

the supervisor to cause an adverse employment action, and if that act is a

proximate cause of the ultimate employment action."  Id. (emphasis in original,

footnotes omitted).  See also, McKenna v. City of Philadelphia, 649 F.3d 171, 178

(3d Cir. 2011).

It is beyond peradventure that the members of the Investigatory Committee

and the member of the Tenure Committee were not accused of improper actions in

Dr. Nouri's previous lawsuits.  No named parties in the previous lawsuits had any

contact with members of either committee, and no committee members were aware

of the previous lawsuits except for being notified that many of the documents they

were provided were obtained during the course of discovery.  (ECF No. 100, Ex. 16, pp. 46-48, 81-82, 92, 100; Ex. 17, p. 120; Ex. 47, pp. 36, 72).  Given these facts, Dr. Nouri does not and could not attempt to argue that either committee held any animus that contributed to his termination.[8]  (ECF No. 109, p. 9).  Rather, he argues that Ms. Hines, Mr. Secor, and Mr. Horne,[9] as agents of PSU, intended to cause Dr. Nouri's termination, and were a proximate cause of the termination.

Dr. Nouri has failed to present any evidence that would implicate Ms. Hines or Mr. Secor in Dr. Nouri's termination.  Dr. Nouri presents nothing more than a conclusory statement regarding Ms. Hines.  Id. at 12.  Furthermore, he presents a single allegation that Mr. Secor was the individual who notified Dr. Spanier of the ongoing case.  Id.  However, Dr. Spanier testified that he did not recall who informed him of Dr. Nouri's action, but if he were to "speculate[,]" it was "quite possible" that Mr. Secor commented on the action.  (ECF No. 109, Ex. 10, p. 11).  Such bald speculation is insufficient to create a genuine issue of fact in this matter.  See, Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir.

---

[8] Dr. Nouri also admitted that he had no evidence that any member of the RA 10 Committee harbored any retaliatory animus against him.  (ECF No. 100, Ex. 2, pp.185-86).

[9] PSU argues that the cat's paw theory does not apply here because the Supreme Court limited its application to supervisors.  (ECF No. 110, p. 4).  However, this reads the Supreme Court's decision too narrowly.  While the Court did in fact employ the language "supervisor", it did so in the overall context of agency law.  Staub, 562 U.S. at 418-22.  The Supreme Court was clear in stating that an "employer is at fault because one of its *agents* committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision."  Id. at 421 (emphasis added).  Consequently, the cat's paw theory may extend to Mr. Horne as an agent of PSU.  E.g., Slater v. Liberty Mut. Ins. Co., No. Civ. A. 98-1711, 1999 WL 178367, at *1 (as a general proposition, an attorney is "an agent of his client").

1999) (superseded by statute on other grounds) (citing <u>Groman v. Township of</u>

<u>Manalapan</u>, 47 F.3d 628, 633 (3d Cir. 1995)).

As to Mr. Horne, there is no evidence in the record that he sought to have

Dr. Nouri fired for retaliatory reasons.[10]  The uncontested evidence establishes that

Mr. Horne reported the instances of plagiarism to PSU solely because it was

standard practice to report such concerns to a client.[11]  (ECF No. 100, Ex. 13, pp.

69-70).  Although Dr. Nouri stresses that Mr. Horne understood his investigation

could have "implications . . . which go beyond . . . defending against Nouri's

lawsuit[,]" that understanding alone does not mean Mr. Horne conducted his

investigation with an eye toward anything other than successfully defending PSU

in litigation, an end that Mr. Horne eventually accomplished.  Nevertheless, Dr.

Nouri argues that a jury could fairly infer a retaliatory animus in light of the fact

that Mr. Horne "spent almost a year" investigating issues of plagiarism.  (ECF No.

109, pp. 13-14).

The facts do not give rise to any presumption that Mr. Horne bore any

retaliatory animus against Dr. Nouri.  At the time Mr. Horne first informed PSU of

his suspicions of plagiarism, litigation was stalled and "very little" was occurring

---

[10] The Court has no difficulty concluding Mr. Horne's report would be sufficient to demonstrate
bias under the summary judgment standard.  As Dr. Nouri points out, the report suggests the
ultimate conclusion that the committees should arrive at, using language such as "[m]y
investigation shows what has been produced in litigation is in fact the work of Dr. Jose
Principe[.]"  (ECF No. 100, Ex. 20).  This is sufficient to satisfy the evidentiary standard.

[11] Similarly, to the extent that Dr. Nouri raises allegations against Wendell Courtney, there is no
evidence that Mr. Courtney harbored any retaliatory animus.

because Dr. Nouri was seeking new counsel.[12]  (ECF No. 100, Ex. 1, pp. 86-87).

In an e-mail dated September 25, 2002, Mr. Horne stated that he had been "trying

to get back on track with" his investigation of Dr. Nouri's plagiarism.  (ECF No.

109, Ex. 4).  Mr. Horne reported plagiarism issues to PSU on October 16, 2002.

(ECF No. 100, Ex. 24).  This suggests that Mr. Horne ceased his investigation

sometime around December 2001, and did not resume it again until mid-September

2002.  He reported his findings to PSU less than one month later.  Mr. Horne's

investigation therefore lasted for, at most, two months after he reported the

misconduct, rather than one year.

    The Court cannot say that such an investigation is of an unusually lengthy

period given: (1) the complexity of the mathematical topics involved; (2) the fact

that Mr. Horne was a layperson in the field of mathematics; and (3) the indubitable

fact that any competent attorney would have conducted a thorough investigation in

order to fulfill his or her ethical obligation to represent a client.  Given that the

investigation was not of an unreasonable duration, no inference may permissibly

be drawn by a finder of fact that the length of the investigation itself was indicative

of a retaliatory animus.

---

[12] The docket report for Dr. Nouri's 2001 litigation, case number 4:01-cv-00840, shows that Dr. Nouri moved to replace counsel on December 10, 2001.  A hearing was held on February 13, 2002.  New counsel did not enter an appearance for Dr. Nouri until June 10, 2002, exactly seven months after Dr. Nouri first sought to replace his attorney.

In the absence of any indication of retaliatory animus, and therefore any indication that the cat's paw theory applies, the impartial investigation conducted by the two committees removed any possible taint of partiality or retaliatory animus linked to Dr. Nouri's termination. Consequently, Dr. Nouri's termination would have occurred in the absence of the alleged wrongful action or actions of the employer. Nassar, 133 S. at 2533. Dr. Nouri has therefore failed to establish a *prima facie* case, and summary judgment must be granted in favor of PSU.

2.    *Pretext*

Even if Dr. Nouri had established a *prima facie* case of retaliation, he has failed to demonstrate that PSU's legitimate, non-discriminatory reason[13] for terminating him was pretext. "To demonstrate pretext under the summary judgment standard, a plaintiff must either (1) offer evidence that 'casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication,' or (2) present evidence sufficient to support an inference that 'discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" Shahin v. Delaware, 563 F.App'x 196, 199 (3d Cir. 2014) (quoting Fuentes, 32 F.3d at 762).

_____

[13] It is undisputed that PSU provided a legitimate, non-discriminatory reason for Dr. Nouri's firing – his acts of plagiarism and concomitant violation of PSU policy. (ECF No. 109, p. 15).

Although the Third Circuit does not require affirmative evidence of retaliation, the standard of proving pretext "places a difficult burden on the plaintiff." <u>Fuentes</u>, 32 F.3d at 765.  This standard requires that a plaintiff "put forward 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence.'" <u>Kautz v. Met-Pro Corp.</u>, 412 F.3d 463, 467 (3d Cir. 2005) (quoting <u>Fuentes</u>, 32 F.3d at 765) (emphasis in original).  Thus, the plaintiff must "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision." <u>Id.</u> (citing <u>Stanziale v. Jargowsky</u>, 200 F.3d 101, 106 (3d Cir. 2000); <u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1110 (3d Cir. 1997)).

The Third Circuit has emphasized that "pretext is not shown by evidence that 'the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'" <u>Id.</u> (quoting <u>Fuentes</u>, 32 F.3d at 765).  Therefore, a plaintiff is required to demonstrate "that the employer's articulated reason was not merely wrong, but that it was 'so plainly wrong that it cannot have been the employer's real reason.'" <u>Jones</u>, 198 F.3d at 413 (quoting <u>Keller</u>, 130 F.3d at 1109).

Dr. Nouri has failed to establish any pretext in his termination.  During litigation, as part of its defense PSU sought copies of the materials and publications that Dr. Nouri had claimed on his previous FARs.  (ECF No. 100, Ex. 10).  Dr. Nouri's attorney submitted numerous documents in reply.  Id. at Ex. 13. After Mr. Horne noticed similarities between Dr. Nouri's purported publications and the work of others, he filed a report of plagiarism to PSU.  Id. at 96-97.

PSU conducted two independent investigations and hearings into the allegations of plagiarism.  Id. at Ex. 16, p. 95-100; Ex. 27, 28, 46, 48.  The Tenure Committee investigation and hearing maintained formalities intended to protect Dr. Nouri's due process rights: he was allowed an attorney; he was allowed to present evidence; he could examine and cross-examine witnesses; and he was allowed to present opening and closing statements.  Id.  The Tenure Committee unanimously determined that Dr. Nouri had committed five acts of plagiarism and recommended his termination from employment at PSU.  Id. at Ex. 48.

The Tenure Committee's conclusion is backed by the force of common-sense.  Comparing the documents produced by Dr. Nouri's attorney in the 2001 lawsuit with the documents published by other individuals reveals startling similarities.  For example, a paper entitled "Application of Dynamic Neural Networks to Approximation and Control of Nonlinear Systems" which lists Dr. Nouri as the sole author is nearly identical to a publication by the same name

39

published under Dr. Amin's name.  Compare id. at Ex. 19 with id. at Ex. 51.

Similarly, two papers submitted by Dr. Nouri during litigation which listed him as

the sole author are substantially similar to thesis papers submitted by two of his

former students.  Compare id. at Ex. 30 with id. at Ex. 31; compare id. at Ex. 32

with id. at Ex. 33.  Dr. Nouri admitted that these documents should not have listed

him as the sole author.  Id. at Ex. 16, pp. 199-201; Ex. 17, p. 37.

Despite the overwhelming evidence of plagiarism, Dr. Nouri denied

responsibility for these documents.  He repeatedly denied any knowledge of the

plagiarized documents, or why they were submitted under only his name.[14]  (ECF

No. 100, Ex. 16, p. 199-201; Ex. 17, p. 19; Ex. 29, pp. 12-13, 15, 22, 27, 31, 48).

It is doubtful that Dr. Nouri's strained explanation would be sufficient to

create even a genuine issue of fact on a motion for summary judgment.  However,

the issue left to this Court's determination is not whether Dr. Nouri's explanations

are sufficient to create genuine doubt as to whether he committed plagiarism, but

whether, in light of those explanations, PSU's decision to terminate his

---

[14] The Court agrees with Dr. Nouri that, under the summary judgment standard, the evidence establishes he did not plagiarize Dr. Principe's work at the Tehran Conference.  While Dr. Nouri asserts that, had the RA 10 Committee not believed Dr. Nouri had plagiarized this materials, the investigation would have ceased and "Dr. Nouri would not have been terminated[,]" this understates the importance of timing in the RA 10 process.  Dr. Nouri did not produce a witness to the Tehran Conference or the expert testimony until *after* the RA 10 Committee concluded there was sufficient evidence to proceed with an investigation.  Without access to this evidence, the RA 10 Committee's determination was not unreasonable at the time it was made.

employment for plagiarism was "so plainly wrong that it" must have been motivated by retaliation. Jones, 198 F.3d at 413.

The uncontested evidence reveals that Dr. Nouri's attorney submitted the papers during litigation, and there is no serious challenge to the fact that Dr. Nouri had provided the documents to his attorney.  PSU's decision to reject Dr. Nouri's proffered explanations was reasonable, and was certainly not plainly erroneous.  It was reasonable to conclude that Dr. Nouri knew the contents of the documents he provided to his attorney and later ratified and claimed ownership of during a deposition.  Dr. Nouri's explanation for these documents was not dissimilar from a young child, caught with cookie crumbs on his face, denying any knowledge of the disappearance of a batch of cookies from the pantry.

In his interview with the Tenure Committee, Dr. Nouri also alleged that the documents were tampered with. Id. at Ex. 17, p. 37-38; ECF No. 109, Ex. 1, p. 219.  To be certain, there is some evidence that the paper entitled "Application of Dynamic Neural Networks to Approximation and Control of Nonlinear Systems" was tampered with, and poorly at that.  However, there is no evidence whatsoever that anyone other than Dr. Nouri himself tampered with the paper.

Dr. Nouri's allegations, with little if any supporting substance or evidence, provided the Tenure Committee with a choice.  It could have discredited Dr. Nouri's assertions and concluded that he, while trying to win a federal lawsuit

41

against an employer with whom Dr. Nouri had grown increasingly antagonistic, submitted falsified papers as his own.  Alternatively, the Tenure Committee could have concluded that the attorneys involved in the litigation, including possibly Dr. Nouri's own attorney, violated federal law and their professional obligations in order to tamper with documents.  The Tenure Committee could also have chosen to believe that Karen Brace, an administrative assistant with nothing to gain from doing so, altered the documents at some unknown time.  Given the absence of evidence demonstrating that a third party tampered with the documents, the Committee's decision to reject Dr. Nouri's dubitable explanations was reasonable.

Considered in view of these facts, Dr. Nouri has failed to "put forward 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence.'"  Kautz, 412 F.3d at 467.  Therefore, summary judgment is appropriate for PSU on claims of retaliation.

### C.    Hostile Work Environment

Finally, PSU moves for summary judgment on Dr. Nouri's hostile work environment claims on the grounds that: (1) Dr. Nouri has failed to exhaust his administrative remedies; (2) the claim is barred by *res judicata*; and (3) the claim fails on the merits.  (ECF No. 101).  This Court concludes that Dr. Nouri's claim fails on the merits.

42

In order to establish a hostile work environment claim under Title VII, a plaintiff must prove that "(1) she suffered intentional discrimination because of her protected activity; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present." Jensen v. Potter, 454 F.3d 444, 449 (3d Cir. 2006) (citations omitted).

To prevail, the plaintiff must show that his workplace was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [his or her] employment and create an abusive working environment." Nat'l. R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002) (internal quotation marks omitted). A court must consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to" a hostile work environment. Faragher v. Boca Raton, 524 U.S. 775, 786-87 (1998) (internal quotations and citations omitted).

Dr. Nouri alleges a hostile work environment based on several instances of harassment, none of which were physical in nature. First, Dr. Nouri alleged that he

was subject to constant surveillance by PSU employees.  (ECF No. 109, Ex. 1, p.

152).  Dr. Nouri also alleged that individuals entered his office without permission,

removed items, and tampered with documents.  Id.  These issues began in the late

1990's, and "became more obvious and more visible or more noticeable" after

September 11, 2001.  Id. at 26.

Dr. Nouri alleges that in one incident Martin Slann, the Director of

Academic Affairs for PSU, summoned Dr. Nouri to his office.  Id. at 153.  As soon

as Mr. Slann was alone with Dr. Nouri "he started shouting, yelling, beating the

table" and threatening to fire Dr. Nouri.  Id. at 153-54.  That incident occurred

"way before" the RA 10 Committee completed its investigation.  Id. at 154.

Dr. Nouri also references a security officer who brought Dr. Nouri's "letter

of termination to [his] class in front of the student, an open letter."  Id. at 159.  The

security officer then ordered Dr. Nouri to leave the campus.  Id.  Finally, he alleges

that the Dean of the Commonwealth Colleges, Diane Disney, told Dr. Nouri that

she could not speak with him.[15]  Id. at 159-60.  Viewing these facts in the light

most favorable to Dr. Nouri, he has not established a genuine issue of material fact

regarding a hostile work environment.

---

[15] Dr. Nouri also alleged a hostile work environment based on PSU's accusation of plagiarism and his subsequent termination based on those accusations.  However, because the Court has concluded that the accusation had merit, and therefore his termination was acceptable, it necessarily follows that these instances were not motivated by intentional discrimination.  Therefore, the Court will not consider these acts as contributing to a hostile work environment.

As discussed previously, Dr. Nouri has failed to establish any instances of discrimination based on his national origin or religion.  Therefore, no hostile work environment claims survive summary judgment based on Dr. Nouri's membership in those protected classes.  The Court will therefore consider allegations of a hostile work environment only through the prism of retaliation, rather than through religious or national origin discrimination.  See, Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006) (affirming the application of Title VII hostile work environment claims to retaliation allegations).

Assuming that Dr. Nouri has established intentional discrimination based on retaliation, he has nevertheless failed to demonstrate that the conduct alleged was severe or pervasive enough to create a hostile work environment.  As an initial matter, the Court previously ruled that any claims Dr. Nouri raised or could have raised in the 1997 or 2001 proceedings are barred by the doctrine of res judicata. (ECF No. 35).  This necessarily includes any claims relating to PSU's alleged surveillance of Dr. Nouri, as well as claims that individuals entered Dr. Nouri's office and removed or tampered with items.  These issues occurred prior to, or during discovery in, the 2001 litigation, and therefore may not be considered in this summary judgment motion.

In that vein, Dr. Nouri alleged during a deposition that these activities began in the late 1990's, but worsened after September 11, 2001.  (ECF No. 109, Ex. 1, p.

26).  Dr. Nouri did not state when the surveillance stopped.  Id.  However, the context of the deposition questioning makes clear that these alleged acts occurred during the time frame at issue in the 2001 litigation.  Specifically, during the questioning regarding these activities, Dr. Nouri was reminded that "at this point all of [the] questions are focused on the 2001 lawsuit; understood?"  Id. at 24.

Because the alleged acts of surveillance occurred during the timeframe covered in the 2001 litigation, they will not be considered by the Court.  In any event, even if the acts of surveillance continued beyond the timeframe relevant to the 2001 litigation, the Court would not consider those acts in this motion for summary judgment.  Important to this Court's holding on that issue is the Third Circuit's decision in Elkadrawy v. Vanguard Grp., Inc., 584 F.3d 169 (3d Cir. 2009).  There, that court stated:

> The fact that several new and discrete discriminatory events are alleged does not [defeat the doctrine of res judicata].  A claim extinguished by res judicata "includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction *or series of connected transactions,* out of which the action arose." Restatement (Second) of Judgments § 24(1) (1982) (emphasis added).

Id. at 174.  "What factual grouping constitutes a 'transaction', and what groupings constitute a 'series', are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit

46

conforms to the parties' expectations[.]"  Huck on Behalf of Sea Air Shuttle Corp.

v. Dawson, 106 F.3d 45, 48-49 (3d Cir. 1997) (quoting Restatement (Second) of

Judgments § 24(2) (1982)).

In this instance, even if the surveillance continued beyond the date of the

2001 litigation, such actions constitute a continuing course of conduct.  The

surveillance activities would all be substantially related in time, space, origin, and

motivation.  Id.  Undoubtedly, treating these actions as a single unit is proper.

Furthermore, similar to the events in Elkadrawy, here when "[c]onsidered

pragmatically, these allegations are indisputably connected: they arise out of a

single employment relationship and involve" the same form of allegedly retaliatory

behavior.  Elkadrawy, 584 at 174.  Consequently, hostile work environment claims

based on such actions are barred from consideration by the Court.[16]

This leaves a total of three incidents which contributed to the purportedly

hostile work environment.  First, Dr. Nouri alleges that his boss, Mr. Slann,

shouted and yelled at him while "beating the table" and threatening to fire him.

(ECF No. 109, Ex. 1, p. 153-54).  This behavior would certainly qualify as

unseemly and unprofessional, but few individuals with any significant amount of

work experience have not experience the displeasure of working for a difficult and

abrasive supervisor.  Second, Dr. Nouri alleges that he was terminated by way of

---

[16] The same analysis applies to Dr. Nouri's reference to a background check conducted by PSU;
that incident likewise will not be considered in determining this summary judgment motion.

being presented a letter of termination while teaching, and was asked to leave campus in front of his students.  Id. at 159.  While the circumstances surrounding Dr. Nouri's termination from PSU were less than ideal, it is difficult to imagine any scenario in which an individual would not feel shame and embarrassment upon being terminated from his or her employment.  Third, Dean Disney refused to speak with Dr. Nouri during a visit to the campus.  Id. at 159-60.

These three instances are insufficient to alter the conditions of Dr. Nouri's employment, Morgan, 536 U.S. at 116, and were neither severe enough nor pervasive enough to create a hostile work environment.  See, Lulis v. Barnhart, 252 F.Supp.2d 172, 177-78 (E.D. Pa. 2003) (nine incidents of sexual conduct over a period of seventeen months was not pervasive); Saidu–Kamara v. Parkway Corp., 155 F.Supp.2d 436, 439–41 (E.D. Pa. 2001) (four incidents of harassment that occurred over eighteen month period, including unwanted sexual touching of the plaintiff's breasts and buttocks, was not severe or pervasive); Bonora v. UGI Utilities, Inc., No. CIV.A. 99-5539, 2000 WL 1539077, at *4 (E.D. Pa. Oct. 18, 2000) (ten incidents of unwanted touching over two year period did not constitute severe or pervasive behavior).  Essentially, the acts described by Dr. Nouri amount to isolated instances of non-severe, unpleasant conduct which, when viewed as a whole, fail to create a genuine issue of fact.  Consequently, judgment is warranted in favor of PSU.

## IV. CONCLUSION

A review of the record demonstrates an absence of evidence supporting Dr. Nouri's claimed religious and national origin discrimination.  Furthermore, PSU has provided legitimate, non-discriminatory reasons for Dr. Nouri's termination, and Dr. Nouri has failed to demonstrate that the reasons offered were mere pretext for retaliation.  Finally, the conduct alleged by Dr. Nouri was neither severe nor pervasive enough to create a hostile work environment.  For those reasons, PSU's Motion for Summary Judgment is granted in full.

An appropriate Order follows.


BY THE COURT:



/s Matthew W. Brann
Matthew W. Brann
United States District Judge